EVANGELINE H. CRAMER, *Respondent*, v. JOHN VAN PARYS
et al., *Appellants*.

*Horswill, Keller, Rohrback, Waldo & Moren* and *Pinck-
ney M. Rohrback,* for appellants.

*Minor, Cogdill & Deno* and *James E. Deno,* for respondent.

CALLOW, J.—A landlord appeals from a judgment in favor of his tenant injured when she fell on a snow-covered stairway leading from her rented apartment.

The tenant testified that on the morning of December 16, 1967, she was descending the stairs with two bags in her arms when she slipped, caught her balance, slipped again, fell and was injured. She said also that she grabbed for the handrail during the second slip, but "it wasn't there anymore."

Error is assigned to the giving of an instruction setting forth the provisions of the Snohomish County Building Code concerning stairway railings. The jury was further instructed that violation of the ordinance constituted negligence as a matter of law. Error is not assigned to the instruction on negligence per se. Section 3305(g) of the Uniform Building Code provides as follows: (These sections in the Snohomish County and Uniform Building Codes are identical.)

> *Handrails.* Stairways shall have handrails on each side, and every stairway more than eighty-eight inches (88″) in width shall have intermediate handrails dividing the stairway into portions not more than sixty-six inches (66″) in width.
> Handrails shall be placed not less than thirty inches (30″) nor more than thirty-four inches (34″) above the nosing of treads[.]

The stairway in question was constructed in two sections, with the bottom part at a right angle to the top section. The top section of the stairs had a metal handrail on each side. The lower section, which consisted of six steps, had a handrail on each side which terminated on the tread of the second step from the bottom, 3 inches back from the outward edge of the step. Therefore, no handrail was opposite the bottom step and a half. This is where plaintiff fell.

The landlord contends the code provision is relevant only to the height of handrails and has no application to the

length or extent of a handrail. The tenant argues that failure to have a railing opposite each step was a violation of the code.

■ The applicable rules of statutory construction were collected in *In re Kent,* 1 Wn. App. 737, 739, 463 P.2d 661 (1969):

> (2) the words of the statute must be understood in their usual and ordinary sense in the absence of statutory definition (*State v. Roadhs,* 71 Wn.2d 705, 430 P.2d 586 (1967)); (3) they must be read in context (*Mercer Island v. Kaltenbach,* 60 Wn.2d 105, 371 P.2d 1009 (1962)); (4) they must be construed to make the statute purposeful and meaningful (*Davis v. Washington Toll Bridge Auth.,* 57 Wn.2d 428, 439, 357 P.2d 710 (1960)); (5) they must be construed to give effect to all the language used (*Danley v. Cooper,* 62 Wn.2d 179, 381 P.2d 747 (1963)); (6) they must be construed to give effect to each word if possible (*Chelan County v. Fellers,* 65 Wn.2d 943, 400 P.2d 609 (1965)); (7) they must be construed so that each part is given effect with every other part or section (*Tacoma v. Cavanaugh,* 45 Wn.2d 500, 275 P.2d 933 (1954)); and (8) the words should not be read in isolation (*Markham Advertising Co. v. State,* 73 Wn.2d 405, 439 P.2d 248 (1968)).

Further the ordinance should be construed as a whole so that the spirit and purpose of the legislation prevails. *Alderwood Water Dist. v. Pope & Talbot, Inc.,* 62 Wn.2d 319, 382 P.2d 639 (1963). The modern trend has been to give legislation enacted to preserve public safety a liberal interpretation in favor of its objectives. 3 J. Sutherland, *Statutory Construction* § 7204 (F. Horack 3d ed. 1943).

■ A further guide to the meaning of the code was offered by the testimony of the administrator for the Snohomish County Building and Plumbing Department whose duties involved the enforcement of the building code in question. It was his opinion that the handrail did not comply with the code provisions in effect at the time of the accident. There was no abuse of discretion by the trial court in admitting this expert testimony. *Nordstrom v. White Metal Rolling & Stamping Corp.,* 75 Wn.2d 629, 453

P.2d 619 (1969); *Palmer v. Massey-Ferguson, Inc.,* 3 Wn. App. 508, 476 P.2d 713 (1970). *Terrace Heights Sewer Dist. v. Young,* 3 Wn. App. 206, 208, 473 P.2d 414 (1970), supports the use of the administrator for this purpose, stating:

> Further, in the construction of statutes and ordinances, as well as resolutions of municipal corporations, the court should give great weight to the contemporaneous construction of an ordinance or resolution by the official charged with its enforcement. *In re Estate of Lloyd,* 53 Wn.2d 196, 332 P.2d 44 (1958).

*See also Morin v. Johnson,* 49 Wn.2d 275, 300 P.2d 569 (1956).

Turning to the ordinance itself, it commences, "Stairways shall have handrails on each side, . . ." and these handrails are to be located "above the nosing of the treads[.]" No other code provisions apply to handrails, and it would be contrary to the purpose of the building code to hold that the ordinance only details the height of handrails but does not contemplate full protection of users by requiring the handrail to extend to the bottom of the stairway. With the rules of construction in mind, we hold that the ordinance requires handrails which extend the full length of the stairway, and the code provisions were properly admitted.

■ The trial court refused to instruct on the doctrine of volenti non fit injuria, and defendant asserts this was error. Quaere: Can volenti non fit injuria or assumption of the risk be a defense to negligence *per se* stemming from violation of an ordinance enacted for the public safety? The elements of volenti are discussed in *Detrick v. Garretson Packing Co.,* 73 Wn.2d 804, 440 P.2d 834 (1968); *Wood v. Postelthwaite,* 6 Wn. App. 885, 496 P.2d 988 (1972).

The plaintiff submitted the case to the jury under theories of negligence per se based on the claimed violation of the stair rail ordinance and common-law negligence stemming from the alleged failure of the landlord to remove snow from the stairway. The landlord proposed instructions

on volenti which commingled the two theories and could have been interpreted by the jury as requiring the application of the doctrine to negligence per se. Close analysis of the proposed instructions reveals that the theories are so intertwined therein as to be inextricable.

In *Kelly v. The Vogue*, 21 Wn.2d 785, 153 P.2d 277 (1944), where an employee was injured on the stairway of an employer, assumption of the risk was held to be no defense in the event the jury found the injury was caused by violation of a statutory duty to provide all stairways with "suitable handrails" and to keep them in "good and safe repair."

In the *Kelly* case, an instruction was approved which informed the jury that a plaintiff assumed no risk in connection with a defendant's violation, if any, of an ordinance.

Other courts have reached similar results in cases involving statutes enacted for the protection of the general public rather than limiting the doctrine to statutes intended to protect employees. W. Prosser, *Torts* § 68, at 454 (4th ed. 1971), remarked that such holdings are based upon the

somewhat ingenious ground that the obligation and the right so created are public ones, which it is not within the power of any private individual to waive. This amounts to saying that the policy of the statutes overrides private agreements and understandings. Such decisions are quite likely to appear in other states in the near future.

Thus in *L'Heureux v. Hurley*, 117 Conn. 347, 355, 168 A. 8 (1933), an injured tenant claimed her injuries stemmed from the landlord's failure to light a stairway as required by a statute, and the court held that a risk forbidden existence by a statute, yet existing because of a violation of the statute, could not be assumed.

The defendants urge that the principle of assumption of risk in a case such as is here presented should be extended beyond mere structural defects—should be extended to all defects of which the person injured had such knowledge that he may be assumed to have waived

the obligation of the person responsible for the defect. Such a waiver constitutes a relinquishment of a personal right. One cannot give what one does not possess. One may waive a personal obligation of another to the one waiving. One cannot waive an obligation owed by another to the public. The obligation of the defendants here in question was a public obligation created by statute and could not be waived by the plaintiff. Moreover, such a waiver in this case must be deduced from an assumption based upon long knowledge and user [*sic*] of the plaintiff and not from express waiver. In treating of the principle of assumption of risk, as applied to master and servant, we find the following statement of the law: "In a case of this sort, where the State imposes a duty, and annexes a penalty to the violation of it, a presumption is raised that the employer who violates his duty to the State has not discharged his duty to his work people, rather than a presumption that, because a workman continues at work in illegal circumstances, even with knowledge of them, he must be taken to waive their effect upon him; or, to state the matter in another way, criminal negligence on the part of the master is more consistent with a neglect of civil duty to his workman than with the existence of an agreement between master and workman to avoid the obligation of the law. This view is in accordance with the weight of authority. In the earliest case dealing with the fencing clauses of the Factory Act, 1844, Parke B., said: 'Though its main object may have been to afford security to children and young persons, who are more likely to sustain injury than others; yet there is a positive enactment that in all factories within the interpretation clause, when any part of the machinery is used for any manufacturing process it shall be securely fenced; consequently, if any person sustains an injury through the violation of this enactment, he has a right to bring an action.' . . . The reasonable conclusion from these *dicta* is that, where a statutory duty exists, the maxim *Volenti non fit injuria* is not to be presumed to avail, or, as Wills, J., says in his judgment in *Baddeley* v. *Earl Granville* [L. R. 19 Q. B. D. 423, 426] 'would not apply at all where the injury arose from a direct breach by the defendant of a statutory obligation.' " 1 Beven, Negligence (4th Ed.) pp. 799 and 802.

"A very decided majority of the later cases declare that assumption of risk may not be set up by an em-

ployer who has violated his statutory duty." 18 R. C. L. 680, note 16.

In a case where a tenant had occupied an apartment for six months and was injured by a lack of a fire escape required by ordinance, the court said: "The plaintiff did not waive the duty which the defendant owed to him under the ordinance as an occupant of the hotel, nor assume the risks incident to its occupation in its then condition. The duty of the defendant to place the fire escapes upon its hotel was not a contractual obligation, and the doctrine of assumed risks has no application to this case. The ordinance is a police regulation, made for the protection of human life, and in the interest of that portion of the public occupying hotels and lodging houses. Public policy requires that duties of this kind be discharged, and that all consequences of a failure to do so shall follow. The individuals who are affected cannot suspend the law by waiver or express contract. The plaintiff had the right to presume that the defendant would obey the law and would provide the fire escapes, and to continue to occupy his room upon the faith of such presumption." *Adams* v. *Cumberland Inn Co.*, 117 Tenn. 470, 481, 101 S. W. 428.

If this were otherwise, it would be possible for the owner of a tenement house of many apartments to expressly notify his tenants of his intention not to light the public halls and stairways, and, though he would be liable to penalty in an action by the State, he could thus defeat action by any tenant who, continuing to reside in such tenement for a substantial period of time, suffered injury proximately caused by such act of the landlord.

*See also Shahinian* v. *McCormick*, 59 Cal. 2d 554, 381 P.2d 377, 30 Cal. Rptr. 521 (1963); *Casey* v. *Atwater*, 22 Conn. Supp. 225, 167 A.2d 250 (1960).

The trial court properly refused the instructions as presented.

■ The jury was instructed:

You are instructed that a landlord has no duty to remove accumulations of snow and ice from common passageways unless you find that the landlord has, in fact, assumed this duty. In the event you so find, then the defendant would be liable for injuries proximately caused by his failure to use reasonable care in the dis-

charge of such duty, taking into consideration all the surrounding facts and circumstances.

The instruction correctly states Washington law relating to a landlord's duty to remove snow and ice. In *Schedler v. Wagner*, 37 Wn.2d 612, 225 P.2d 213, 26 A.L.R. 604 (1950), the court stated at page 615:

Ordinarily, the landlord of premises leased to different tenants, who use in common the approaches thereto, is not liable for accumulations of snow and ice due to natural causes, and hence is not liable for injuries to persons using these portions of the premises, due to accumulations of this character. . . .

Where, however, the landlord has obligated himself to remove the snow and ice from facilities used in common, or has assumed this duty, he must remove the snow and ice if an accumulation of this nature renders the premises unsafe, and for his negligent failure so to do he will be liable to a person thereby injured while making a proper use of this portion of the leased premises, the injured person being a tenant.

(Citations omitted.)

The landlord assigns error to the refusal to give the following additional instruction:

In considering the reasonableness of the conduct of the defendants, you are instructed that defendants would not be required to clean the steps prior to the elapsing of a reasonable time after the cessation of the storm.

The following cases are cited as support for the proposed instruction. *Young v. Saroukos*, 55 Del. 149, 185 A.2d 274 (1962); *Reuter v. Iowa Trust & Sav. Bank*, 244 Iowa 939, 57 N.W.2d 225 (1953); *Goodman v. Corn Exch. Nat'l Bank & Trust Co.*, 331 Pa. 587, 200 A. 642 (1938); and *Walker v. Memorial Hosp.*, 45 S.E.2d 898 (Va. 1948), wherein the court stated the reason for the rule as follows:

The general controlling principle is that changing conditions due to the pending storm render it inexpedient and impracticable to take earlier effective action, and that ordinary care does not require it.

The reasons for a rule contra to that expressed above are

articulated in *Pessagno v. Euclid Inv. Co.*, 112 F.2d 577 (D.D.C. 1940).

The facts of the case raise a single question: Is a landlord, who rents apartments in his building to various tenants and reserves control of the common approaches, obligated to use reasonable care, during the progress of a storm, to remove or render harmless ice forming thereon from natural causes? . . .

. . .

. . . [The other view] overlooks the obligation of the owner of a large apartment house not only to exercise ordinary care to construct the approaches and other parts of the building under his exclusive control so that they will be reasonably safe, but likewise, after notice, to exercise ordinary care to keep them free from conditions, whether permanent or temporary, which make them dangerous to the tenants or their guests. Wardman v. Hanlon, 52 App.D.C. 14, 280 F. 988, 26 A.L.R. 1249.

If, therefore, appellee in the case under consideration knew or in the exercise of ordinary care ought to have known of the dangerous condition of the driveway and failed to exercise the degree of care which an ordinarily prudent person, in view of existing circumstances, would have exercised to avoid injury to a person lawfully using it in the exercise of due care for his own safety, appellant was entitled to a verdict. . . . The question whether, in these circumstances, what was done was reasonable care was, in our opinion, a question for the jury under proper instructions from the court.

In adopting this rule, we are not, as counsel say, imposing on the owner of the premises a burden physically impossible to discharge or one which makes the owner the guarantor of the safety of his tenants and their guests. We do not hold there was an absolute duty to provide a safe entrance or to keep it safe by extraordinary or unusual means. If the storm made the spreading of sand or ashes or some other preventive impossible or even useless, no reasonable person would expect it to be done, or if the spreading of sand every two or three hours might be expected to accomplish reasonable safety, what appellee did in that regard was sufficient. All that we hold is that there was a duty in the circumstances to be reasonably alert that persons lawfully using the property should be safeguarded against danger which could,

in the exercise of ordinary care, be foreseen and prevented.

(Footnotes omitted.)

The approach of the *Pessagno* case has been followed in *Harris v. H. G. Smithy Co.,* 429 F.2d 744 (D.C. Cir. 1970); *Rodenbur v. Kaufmann,* 320 F.2d 679 (D.C. Cir. 1963); *Nielsen v. Barclay Corp.,* 255 F.2d 545 (D:C. Cir. 1958); *C. W. Simpson Co. v. Langley,* 131 F.2d 869 (D.D.C. 1942); *Frazier v. Edwards,* 117 Colo. 502, 190 P.2d 126 (1948). The rule of *Pessagno* is practical and supported by the preferable reasoning. The rule enunciated to cover such a responsibility should be as applicable to the climatic conditions of the eastern part of our state as to the western and as appropriate to the valleys as to the mountain passes. Whether a landlord was negligent in failing to remove snow from common areas is best left to the jury. In weighing the relevant circumstances, a jury might consider the nature and size of the apartment, the age and number of tenants expected to use the slippery area, the size of the area in need of cleaning, the current and anticipated weather conditions and the practicality of other safety measures or methods of ingress and egress. In weighing these factors, a jury might hold the urban landlord of a large building to a different standard of care than the rural landlord of a small building who does not live in the building. To permit any landlord under any circumstance to always wait until the end of a storm before removing snow would create a rigidity in the law inconsistent with the innumerable variables that are possible.

The instruction as given allowed appellant to argue these factors to the jury and was, therefore, correct.

■ The landlord's final assignment of error is to the refusal to allow him to testify to his monthly income from the apartment building. His counsel offered the evidence to show that the landlord could not afford "to have someone hired to do the managerial work on the apartment, . . ." Evidence of the financial circumstances of the parties to an

594

action is ordinarily immaterial and irrelevant. *Chicago Daily News Employes Credit Union v. Reed,* 42 Ill. App. 2d 336, 192 N.E.2d 447 (1943); *Meagher v. Garvin,* 80 Nev. 211, 391 P.2d 507 (1964); *Nollmeyer v. Tacoma Ry. & Power Co.,* 95 Wash. 595, 164 P. 229 (1917).

The purpose for which the evidence was offered does not convince us of its materiality here. Financial hardship cannot be an excuse for failing to perform a duty undertaken for economic benefit.

The judgment of the trial court is affirmed.

HOROWITZ, C.J., and SWANSON, J., concur.

Petition for rehearing denied November 13, 1972.